# Authority of OPM to Direct Health Insurer Not to Enroll Individual Deemed Eligible by Employing Agency

Under both the regulations it has issued for administering the Federal Employees Health Benefits Act and its contract with the insurance carrier, the Office of Personnel Management has authority to direct a carrier not to enroll an individual in a health plan if OPM disagrees with the employing agency's determination that the enrollment is permissible under federal law.

In the circumstances presented here, the law does not allow OPM to exercise its general administrative discretion in a manner that would permit such an enrollment to proceed.

January 20, 2010

MEMORANDUM OPINION FOR THE GENERAL COUNSEL
OFFICE OF PERSONNEL MANAGEMENT

This memorandum elaborates upon legal advice our Office previously provided to you orally and by e-mail concerning the authority of the Office of Personnel Management ("OPM") to direct the Blue Cross and Blue Shield Association ("BC/BS") not to enroll a federal employee's same-sex spouse in a federal health benefits plan, in a situation where the relevant employing agency has determined that the spouse is eligible to enroll. We previously advised both that OPM possesses the authority to direct non-enrollment and that, in the circumstances presented here, the law does not allow OPM to exercise its general administrative discretion in a manner that would permit such an enrollment to proceed. We reach this conclusion based on our understanding of the Federal Employees Health Benefits Program ("FEHBP") and of basic principles of administrative and government contracting law, although we acknowledge that there is no express provision of the Federal Employees Health Benefits Act ("FEHBA")—the statute governing the FEHBP—or OPM's organic statute that precisely addresses a situation like this or that expressly imposes a duty upon OPM to countermand an employing agency's enrollment determination when OPM believes that determination to be inconsistent with the statutory bounds established by the FEHBA. Because this issue arises in a highly unusual and complex procedural posture, we begin by setting forth in some detail the factual background that informs our understanding of the questions you have posed and the answers that we provide. We then explain why we believe that OPM has the

51

authority to direct non-enrollment here, as well as why we believe the law does not allow OPM to permit the enrollment to proceed in these circumstances.

## I.

In 2008, Karen Golinski, a staff attorney for the U.S. Court of Appeals for the Ninth Circuit, applied for benefits for her same-sex spouse under the FEHBP. Under the regulatory scheme established for administering the FEHBP, the Administrative Office of the United States Courts ("AOUSC"), as Ms. Golinski's employing agency, deemed Ms. Golinski's spouse ineligible to receive benefits. Accordingly, the AOUSC refused to submit Ms. Golinski's health benefits election form to her insurance carrier, BC/BS. In response, Ms. Golinski filed a complaint under the Ninth Circuit's Employee Dispute Resolution ("EDR") plan, which establishes the Ninth Circuit's internal procedure for resolving employee disputes. In that complaint, she alleged that the AOUSC's failure to submit her form violated the Ninth Circuit's EDR plan and its Equal Employment Opportunity ("EEO") plan because it amounted to discrimination on the basis of sex and sexual orientation. *See In re Golinski*, 587 F.3d 901, 902 (9th Cir. 2009).

The Chief Judge of the Ninth Circuit, Alex Kozinski, sitting as the hearing officer administering the EDR plan, agreed with Ms. Golinski's complaint. He concluded that the FEHBA permitted employing agencies to enroll same-sex spouses notwithstanding the Defense of Marriage Act ("DOMA") and thus that denying health insurance to Ms. Golinski's spouse violated the prohibitions against discrimination in the Ninth Circuit's EDR and EEO plans. He ordered the Director of the AOUSC to submit Ms. Golinski's health benefits election form "to the appropriate health insurance carrier." *Id.* at 904.

In response to the Chief Judge's order, OPM, by letter dated February 20, 2009, advised the AOUSC that "[p]lans in the FEHBP may not provide coverage for domestic partners, or legally married partners of the same sex, even though recognized by state law." Letter for Nancy E. Ward, Deputy Assistant Director, Office of Human Resources, Administrative Office of the United States Courts, from Lorraine E. Dettman, Assistant Director, Office of Insurance Services Programs, Office of

Personnel Management (Feb. 20, 2009) ("Dettman Letter"). The letter referenced prior guidance from OPM on that same point. *See* Office of Personnel Management, Benefits Administration Letter No. 96-111, at 3 (Nov. 15, 1996) ("[DOMA] clarifies that same-sex marriages cannot be recognized for benefit entitlement purposes under . . . FEHB[.]"). The letter further advised that OPM had informed BC/BS that it "may not accept the enrollment forms submitted by your agency to provide coverage that is not allowed under Federal law." Dettman Letter; *see also* Letter for Stephen W. Gammarino, Senior Vice President, National Programs, Blue Cross Blue Shield, from Shirley R. Patterson, Chief Insurance Contracting Officer, Office of Insurance Services Programs, Office of Personnel Management (Feb. 23, 2009) ("Under [the FEHBA and DOMA], Ms. Golinski may not provide coverage for her same-sex spouse, even though the marriage may be recognized by state law. Therefore, we are advising you that you may not accept the enrollment form submitted by the Administrative Office of the United States Courts to provide coverage that is not allowed under Federal law.").

In response to OPM's letter to the AOUSC, its advice to BC/BS not to permit the enrollment, and the fact that the carrier had not actually enrolled Ms. Golinski's spouse following the Chief Judge's initial order, the Chief Judge issued a new order dated November 19, 2009. In that order, the Chief Judge reiterated Ms. Golinski's entitlement to relief and ordered the AOUSC to resubmit her health benefits election form to BC/BS. He further concluded that OPM's actions in issuing guidance or otherwise directing the carrier not to enroll Ms. Golinski's spouse violated separation of powers principles; he directed OPM to "rescind" its "guidance or directive" instructing BC/BS that Ms. Golinski's wife was not eligible to enroll; and he instructed OPM to refrain from "interefer[ing] in any way with the delivery of health benefits to Ms. Golinski's wife on the basis of her sex or sexual orientation." *In re Golinski*, 587 F.3d 956, 963–64 (9th Cir. 2009) ("November 19, 2009 Order").[1]

---

[1] On December 17, 2009, BC/BS filed a petition for review of the November 19, 2009 Order with the Ninth Circuit Judicial Council, arguing that "the Judicial Council has no jurisdiction over BC/BSA under the EDR Plan" and that the Chief Judge's conclusion that the FEHBA allows enrollment of same-sex spouses was incorrect in any event. *See* Petition for Review for Blue Cross and Blue Shield Association at 1, 9, *In re Golinski*, No. 09-80173 (9th Cir. Dec. 17, 2009). On December 22, 2009, Chief Judge Kozinski

In light of this order, you asked whether, assuming the AOUSC re-submits Ms. Golinski's health benefits form to BC/BS, OPM may again direct or otherwise advise BC/BS not to enroll her spouse in the health benefits plan, such as by affirming its prior statements to that effect in some manner. You also asked whether, assuming OPM wishes to permit the enrollment to proceed now that Chief Judge Kozinski has issued his most recent order, it may rescind its prior guidance and advise BC/BS that enrollment would be permissible.

In answering these questions, we do not believe the November 19, 2009 Order from Judge Kozinski materially affects OPM's legal authorities or obligations with respect to the enrollment at issue. As we previously advised you, that order could not bind OPM because it was issued in an administrative capacity under the EDR plan. *See* E-mail for Elaine Kaplan, General Counsel, Office of Personnel Management, from David Barron, Acting Assistant Attorney General, Office of Legal Counsel (Dec. 16, 2009, 5:37 PM EST).* As a result, we do not believe OPM is required to comply with the Order's directives. OPM's legal authorities and obligations, if any, arise from the FEHBA, OPM's organic statute, the relevant regulations OPM has issued, and its contract with BC/BS, and it is to these legal sources that we look for guidance.[2]

---

issued a new order, noting that the time for filing appeals of his prior orders had expired and concluding that his "prior orders in this matter are therefore final and preclusive on al1 issues decided therein as to others who could have, but did not appeal, such as the Office of Personnel Management . . . and the Administrative Office of the United States Courts." *In re Golinski*, No. 09-80173, at 1 (9th Cir. Dec. 22, 2009).

* Editor's Note: On the same day that it issued this memorandum opinion, the Office issued a separate opinion memorializing the advice in the December 16, 2009 e-mail. *See Legal Effect of Federal Judge's Order as Hearing Officer Under Court's Employment Dispute Resolution Plan*, 34 Op. O.L.C. 25 (2010).

[2] We note that, on June 17, 2009, President Obama issued a presidential memoran-dum in which he required the heads of certain executive departments and agencies to extend various benefits to same-sex domestic partners, and the heads of other execu-tive departments and agencies to determine what additional measures could be taken "to provide benefits to the same-sex domestic partners of Federal Government em-ployees." Memorandum for the Heads of Executive Departments and Agencies (June 17, 2009), https://obamawhitehouse.archives.gov/the-press-office/memorandum-heads-executive-departments-and-agencies-federal-benefits-and-non-discri. That memoran-dum does not affect our analysis because, as it made clear, it did not purport to alter existing statutory limitations on agencies' authority. *See id.* ("Executive departments and

## II.

We begin by examining OPM's authority to direct a carrier not to enroll an individual in a health plan—or, at least, to affirm its prior non-enrollment directive or guidance—in the event that OPM disagrees with a federal employing agency's determination that the enrollment is permissible under federal law. There are two potential sources of such authority: OPM's own regulations for administering the benefits program, issued pursuant to the FEHBA, and its contract with the carrier (here BC/BS). We consider each of these potential sources of authority in turn.

We note at the outset that OPM has already advised as to BC/BS's legal authority to enroll in this case, as reflected in the letter OPM issued to BC/BS following Chief Judge Kozinski's initial order. Moreover, as we have previously advised, Chief Judge Kozinski's subsequent November 19, 2009 Order is not binding on OPM because it was issued by the Chief Judge in his administrative capacity. Accordingly, there has been no intervening event that would appear to strip OPM of the authority it previously exercised in this case to prevent the enrollment from proceeding. Nonetheless, if the AOUSC resubmits Ms. Golinski's enrollment form and the carrier again asks OPM how it should respond, OPM may face anew the question whether it possesses the authority to direct or otherwise advise that the enrollment may not occur (even if such action were only to take the form of an affirmation of OPM's prior directive or guidance). Accordingly, we now address OPM's power to so advise or direct. As we explain further below, OPM possesses the authority to issue a directive (or affirm its previous directive or guidance) under both the regulations it has issued for administering the FEHBA and its contract with BC/BS, which, among other things, incorporates regulations governing federal contract law.

---

agencies . . . may only provide benefits . . . if they have legal authorization to do so. My Administration is not authorized by Federal law to extend a number of available Federal benefits to the same-sex partners of Federal employees."); *see also id.* (providing that recommendations for the extension of benefits should be "consistent with existing law").

## A.

We begin by considering OPM's authority to take action to prevent enrollment under its own regulations. Acting under the authority granted by the FEHBA, OPM has entered into contracts with various health insurers, including BC/BS, to provide health care to federal employees and other persons covered by the FEHBA. Rather than retaining all authority to supervise implementation of these contracts, OPM has delegated to the employing offices of agencies participating in the FEHBP the authority to make both initial and final enrollment eligibility determinations. *See* 5 C.F.R. § 890.104 (2009).[3] The regulations expressly reserve to OPM, however, the discretion to "order correction of an administrative error upon a showing satisfactory to OPM that it would be against equity and good conscience not to do so." *Id.* § 890.103(b).

At the time these regulations were promulgated, OPM explained that "an administrative error occurs when *an employing office misapplies the law or regulations*, misinforms employees, or fails to inform employees when required to do so." 59 Fed. Reg. 66434, 66434 (Dec. 27, 1994) (emphasis added). Thus, "administrative error" includes clear statutory error. Admittedly, the purpose of the regulation, at least in significant part, was to provide OPM with a means of correcting errors by employing agencies that were *adverse* to the employee: in its *Federal Register* notice promulgating the relevant regulations, OPM explained that "administrative error" included "any mistake on the part of the employing office that directly results in the loss of a benefit or opportunity to an employee." *Id.* Here, of course, OPM would be confronted with the opposite circumstance because a determination by the employing agency that the employee's same-sex spouse is eligible for enrollment would constitute clear

---

[3] We note that in delegating authority to make final enrollment determinations for the Judicial Branch to the AOUSC, OPM apparently relied on its general rulemaking authority under the FEHBA. *See* 5 U.S.C. § 8913(a) (2006) ("The Office of Personnel Management may prescribe regulations necessary to carry out this chapter."); *id.* § 8913(b) ("The regulations of the Office may prescribe the time at which and the manner and conditions under which an employee is eligible to enroll in an approved health benefits plan[.]"). We express no view on whether this rulemaking authority permits such a delegation, because even if the AOUSC did not have validly delegated authority to make a final judgment on enrollment, OPM would nonetheless maintain the authority to issue a non-enrollment directive, or otherwise correct AOUSC's decision.

statutory error *favorable* to the employee. Thus, the issue is whether the OPM regulation in question would authorize OPM to "order correction of an administrative error" that would *benefit* the employee.

OPM has informed us that, notwithstanding its focus on adverse impacts on employees in the *Federal Register* discussion of "administrative error," it has in practice applied this regulation to correct errors even when the mistake would have benefitted the employee. *See* Memorandum for David Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Elaine D. Kaplan, General Counsel, Office of Personnel Management, *Re: Request for Second OLC Opinion Regarding* In re Golinski*, No. 09-80173 (9th Cir. Nov. 19, 2009)*, at 6 (Dec. 8, 2009) ("Kaplan Memo") ("According to program staff, OPM has, in the past, occasionally requested that agencies correct enrollment errors that it believes are contrary to law, whether those errors are harmful or beneficial to the employee."). As you have explained, although "[t]he language of the regulation, and its history . . . , might suggest that OPM's authority to correct administrative errors was designed to protect employees from harm," in practice "OPM has not limited its correction of administrative errors to this narrow context." *Id.*

In our view, OPM may reasonably interpret its regulation to confer the authority to correct a clear statutory error by the employing agency, even if that error would be to the employee's benefit. *See Auer v. Robbins*, 519 U.S. 452, 461 (1997) ("Because the salary-basis test is a creature of the Secretary's own regulations, his interpretation of it is, under our jurisprudence, controlling unless plainly erroneous or inconsistent with the regulation." (internal quotation marks omitted)); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945) ("the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation"). The plain text of the regulation itself is not limited to correction of errors that harm employees. And in defining an "administrative error" to "include" actions that are adverse to employees, the statement in the *Federal Register* does not foreclose circumstances in which an administrative error subject to correction could also include final action by an employing agency that favors the employee. Similarly, although the regulation's reference to "equity and good conscience" connotes the provision of relief to an employee who has suffered harm from an employing agency's adverse ac-

tion, 5 C.F.R. § 890.103(b); *see also* 59 Fed. Reg. at 66435 ("[W]ithout the authority to order a correction, OPM could not overrule an agency reconsideration decision that is obviously in disregard of law and regulations *and* is unfair to the employee." (emphasis added)), it does not compel the conclusion that OPM's discretion under the regulation is limited to providing such relief. Rather, OPM could reasonably construe the regulation, including the phrase "equity and good conscience," to permit it to intervene to stop an employing agency from making an enrollment decision that would be clearly unlawful under the FEHBA, as a matter of its equitable authority to ensure that the legal limits of the benefits program are respected. Thus, we believe the regulations provide a legal basis for OPM to correct an erroneous enrollment decision made by an employing agency.[4]

## B.

Independent of OPM's corrective authority under the regulations described above, OPM also possesses authority to direct non-enrollment under its contract with BC/BS. It is our understanding that OPM concurs in this construction of the authority the contract confers upon the agency. Kaplan Memo at 7 ("As applied to the Golinski matter, it is our view that OPM had the contractual authority to intervene as it did last February to prevent Ms. Golinski's enrollment form from being processed by BC/BS.").

The contract provides that a person's eligibility for coverage shall be determined by OPM's regulations. But the contract also independently provides that "[t]he applicable provisions of . . . chapter 89 of title 5, United States Code"—i.e., the FEHBA—"constitute a part of this contract as if fully set forth herein." Federal Employees Health Benefits Program Standard Contract for Fee-for-Service Carriers § 1.4(a) (2009) ("BC/BS Contract"). In the event that there is a conflict between the regulations and the FEHBA, moreover, the contract provides that "[a]ny inconsist-

---

[4] We do not address the precise means by which such a correction should be made, and in particular whether the corrective action should take the form of an order superseding the employing agency's final determination, an order directing the employing agency not to submit enrollment forms despite its final determination to the contrary, or a directive to the carrier not to carry out the enrollment.

ency . . . shall be resolved by giving precedence in the following descending order: The Act, the regulations in part 890, title 5, Code of Federal Regulations, the regulations in chapters 1 and 16, title 48, Code of Federal Regulations, and this contract." *Id.* § 1.3. Thus, under the contract's own terms, even if an enrolling agency has determined that a same-sex spouse is eligible for coverage, the statutory prohibition on the carrier's providing coverage to same-sex spouses prevails over the employing agency's determination (which is made pursuant to regulation).

To be sure, the contract does not require the carrier to engage in an independent evaluation of the statutory eligibility of every individual whose enrollment forms are forwarded by an employing agency. The contract does provide, however, that the carrier is subject to OPM's discretion in making enrollment decisions. For example, the contract provides that a carrier's decision regarding a person's eligibility for coverage is "determined in accordance with regulations *or directions of OPM given pursuant to chapter 89, title 5, United States Code*." *Id.* § 2.1(a)(2) (emphasis added). The contract also expressly incorporates chapters one and sixteen of the Federal Acquisition Regulations System ("FAR"), *see id.* § 1.4(a), which provide (in the general provisions located in chapter one) that "[c]ontracting officers are responsible for . . . ensuring compliance with the terms of the contract, and safeguarding the interests of the United States in its contractual relationships," 48 C.F.R. § 1.602-2. The regulations specifically relating to health plan contracts (located in chapter sixteen of the FAR) also make clear that OPM can issue directives to carriers, providing that carriers "must perform the contract in accordance with prudent business practices," including "[t]imely compliance with OPM instructions and directives." *Id.* § 1609.7001(b)(1). A carrier's failure to comply with OPM instructions can provide cause for OPM to "withdraw[] . . . approval of the health benefits carrier and terminat[e] . . . the carrier's contract." *Id.* § 1609.7001(b); *see also id.* § 1609.7001(a) (requiring "[t]he carrier of an approved health benefits plan" to "meet the requirements of chapter 89 of title 5, United States Code" and providing that its failure to do so can provide cause for termination of the contract); *see also* 5 C.F.R. § 890.204 (2009) ("The Director may withdraw approval of a health benefits plan or carrier if the standards at § 890.201 of this part and 48 CFR subpart 1609.70 are not met."); *Bridges v. Blue Cross & Blue Shield Ass'n*, 935 F. Supp. 37, 42 (D.D.C. 1996) ("OPM also has the

power to penalize or debar carriers who violate the terms of their contracts with the OPM."). Consistent with these authorities, the contract itself requires the carrier to retain records so OPM can assess the carrier's compliance with the contract. *See* BC/BS Contract § 3.8 ("the Carrier will retain and make available all records applicable to a contract term that support the annual statement of operations"); *see also* 48 C.F.R. § 1652.204-70 (requiring inclusion of section 3.8 in all FEHBP contracts); *id.* § 1609.7001(a)(4) ("[The carrier] must permit representatives of OPM and of the General Accounting Office to audit and examine its records and accounts which pertain, directly or indirectly, to the plan at such reasonable times and places as may be designated by OPM or the General Accounting Office."); *Bridges*, 935 F. Supp. at 43 ("[c]arriers must also submit to audits by the OPM").[5]

In light of these contractual provisions, and in accord with OPM's own view of its contractual authority, we conclude that OPM has authority under the contract to direct BC/BS not to enroll an individual who is ineligible under the FEHBA.

## III.

That OPM possesses the authority to direct the carrier not to enroll a person whom OPM determines is ineligible for coverage does not resolve how OPM should respond to an employing agency's determination that such person *is* eligible for enrollment. You have explained that OPM

---

[5] The contract also obligates the carrier to "notify the Contracting Officer of any Significant Event within ten (10) working days after the Carrier becomes aware of it." BC/BS Contract § 1.10(a). The contract defines a "Significant Event" to include, among other things, "any occurrence or anticipated occurrence that might reasonably be expected to have a material effect upon the Carrier's ability to meet its obligations under this contract, including, but not limited to . . . [a]ny significant changes in policies and procedures or interpretations of the contract or brochure which would affect the benefits available under the contract or the costs charged to the contract." *Id.* § 1.10(a)(11). Although this provision might be read to encompass only changes in the particular selection of benefits available to persons enrolled in the plan, it could also be read to cover a situation where the statute by its terms renders ineligible for benefits a class of persons whom the employing agency has deemed eligible. The contract provides that, upon learning of a Significant Event, "OPM may institute action, in proportion to the seriousness of the event, to protect the interests of Members, including . . . [d]irecting the Carrier to take corrective action." *Id.* § 1.10(b)(1).

believes its authority to correct an administrative error by the employing agency regarding eligibility is "discretionary and not mandatory" because "[t]he regulations contemplate that the correction of 'administrative errors' by OPM will be ordered only where OPM concludes that it would be against equity and good conscience not to do so." Kaplan Memo at 7 (quoting 5 C.F.R. § 890.103(b)). On that basis, OPM concludes that it "could reasonably find that equity and good conscience do not require it to intervene in any new enrollment action that may be triggered by [Chief] Judge Kozinski's Order" because (1) OPM has an interest in "affording comity to [Chief] Judge Kozinski's opinion," (2) enrolling Ms. Golinski's spouse would have a "negligible impact . . . on the FEHBP both as a matter of its cost and precedential effect," and (3) OPM has an interest in avoiding litigation. *Id.* Furthermore, you have informed us that OPM believes its contract with BC/BS does not limit the discretion that it retains under section 890.103(b) to permit an enrollment to proceed— even if OPM believes such enrollment to be in contravention of the FEHBA's eligibility limitations. *Id.* at 7. For the reasons set forth below, we disagree, and conclude instead that OPM does not have the authority to permit the enrollment to proceed in the circumstances at issue here.

## A.

In evaluating OPM's discretion to permit the enrollment of a same-sex spouse of an FEHBP member to proceed, we start with the assumption that OPM does not have a general obligation to ensure that all enrollment decisions employing agencies make comply with the FEHBA, at least insofar as such a duty would impose on OPM the onerous obligation of reviewing each and every enrollment determination before it is implemented. The statutory and administrative framework that governs the FEHBP plainly does not contemplate such direct, *ex ante* OPM supervision of all enrollment decisions. At the same time, however, the absence of an obligation on OPM to assess the eligibility of each enrollee *sua sponte* does not mean that OPM retains the discretion to knowingly permit an unlawful enrollment to proceed when it has been specifically informed of the enrollment before it occurs and could easily take action to prevent it from occurring. Still less does the absence of such a general duty mean that OPM may take affirmative steps intended to permit such an enrollment to proceed that otherwise would not.

In the particular factual circumstances at issue here, although there is no express statutory provision that resolves the scope of OPM's obligation in a clear manner, we believe that the law is best read not to allow OPM to permit the enrollment to proceed. The employing agency's eligibility decision would be in clear violation of the FEHBA (as OPM acknowledges), and it would appear that to prevent the enrollment from proceeding OPM need only affirm its prior directive or guidance when asked by the carrier whether it should carry out the enrollment. By contrast, to permit the enrollment to proceed, OPM would have to take action, contrary to its prior guidance, intended to assure the carrier that it may accept an enrollment that OPM has determined to be unlawful. In our view, the relevant statutory, regulatory, and contractual provisions cannot be read, in light of more general administrative law principles, to permit OPM to exercise its administrative discretion in such a manner.

We base our conclusion on our interpretation of the FEHBA, as informed by the general obligation of agencies to respect the limits of their authority under their authorizing statutes. Under the terms of the FEHBA, OPM does not have the authority to extend benefits to persons who are not authorized to receive benefits under the statute, including the same-sex spouses of federal employees. Specifically, the FEHBA authorizes OPM to "contract for or approve . . . [o]ne Government-wide plan . . . under which payment is made by a carrier under contracts with physicians, hospitals, or other providers of health services for benefits . . . given to employees . . . [and] members of their families." 5 U.S.C. § 8903(1) (2006). The FEHBA expressly defines "member of family" to mean "the spouse of an employee or annuitant and an unmarried dependent child under 22 years of age." *Id.* § 8901(5). DOMA, in turn, provides that the term "spouse" refers "only to a person of the opposite sex who is a husband or a wife." 1 U.S.C. § 7 (2006). Consistent with these provisions, OPM has taken the position that "[p]lans in the FEHB may not provide coverage for domestic partners, or legally married partners of the same sex, even though recognized by state law," Dettman Letter; *see also* Benefits Administration Letter No. 96-111, at 3 ("[DOMA] clarifies that same-sex marriages cannot be recognized for benefit entitlement purposes under . . . FEHB[.]"), and OPM has advised us that this remains its position, Kaplan Memo at 3 ("OPM has concluded that it is prohibited by law from providing FEHBP benefits to same-sex spouses.").

The fact that OPM holds this view is significant for purposes of determining the scope of its authority to permit the enrollment of a same-sex spouse in these circumstances. It means that this is not a case in which OPM, in permitting the enrollment to proceed, could be understood to be merely deferring to an employing agency's reasonable construction of an ambiguous statutory term. Rather, by taking steps intended to permit the enrollment of a same-sex spouse to proceed, OPM would be taking steps to permit—rather than protect against—an enrollment that OPM believes to be unlawful under the clear terms of the statute it administers. Such action would appear to be inconsistent with the basic principle that an agency may not act beyond its statutory authority. *See* 1 General Accounting Office, *Principles of Federal Appropriations Law* 3-16 (3d ed. 2004) ("GAO Redbook") (explaining that "[i]t is a fundamental proposition that agency regulations are bound by the limits of the agency's statutory and organic authority"); *Dow Chemical Co. v. EPA*, 605 F.2d 673, 681 (3d Cir. 1979) (agencies may not "extend their statutory authority beyond that delegated to them by Congress"); *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 621 (D.C. Cir. 1992) ("It is 'central to the real meaning of "the rule of law," [and] not particularly controversial' that a federal agency does not have the power to act unless Congress, by statute, has empowered it to do so. Agency actions beyond delegated authority are 'ultra vires,' and courts must invalidate them." (internal citation omitted)); *Aluminerie Becancour, Inc. v. United States*, 28 Ct. Int'l Trade 2060, 2066 (2004) (the authority of federal agencies to contract "is necessarily constrained by the statutes under which the agency operates, by regulations, and by applicable case law"). It would also appear to be inconsistent with OPM's more specific obligation to "act in a manner consistent with the underlying purposes" of the FEHBA. *Nat'l Fed'n of Fed. Emps. v. Devine*, 679 F.2d 907, 912 (D.C. Cir. 1981).

Indeed, in accord with this general principle, courts have recognized that agencies have no general authority to waive statutory restrictions that Congress has imposed in establishing a benefits program. As the Eighth Circuit has explained, a federal agency "cannot extend benefits by regulation to a class of persons not included within the authorizing statute," and "[t]o the extent . . . regulations can be read to confer benefits not authorized by the Act's statutory provisions, they are beyond the agencies' delegated powers." *Harris v. Lynn*, 555 F.2d 1357, 1359 (8th Cir. 1977);

*see Schoemakers v. OPM*, 180 F.3d 1377, 1382 (Fed. Cir. 1999) ("Neither courts nor administrative agencies . . . have the authority to waive requirements . . . that Congress has imposed as a condition to the payment of federal money."); *Crown v. U.S. R.R. Retirement Bd.*, 811 F.2d 1017, 1021 (7th Cir. 1987) ("A congressional mandate to pay statutory benefits . . . leaves no discretion in the agencies and courts but to limit the payment of benefits to those entitled to them." (quotations omitted)).

To be sure, OPM has in this case delegated authority to the AOUSC to make enrollment decisions for judicial employees, and we recognize that this delegation means that OPM's role in allowing the enrollment is somewhat less affirmative than it would be had it not made the delegation. But for the following reasons, this delegation of the authority to make eligibility determinations does not fundamentally alter our analysis.

As a preliminary matter, OPM did not delegate all of its discretion. It delegated to employing offices the responsibility to make enrollment decisions, 5 C.F.R. § 890.104, but it retained the responsibility to "contract for or approve" health benefit plans that meet the statutory requirements, 5 U.S.C. § 8903, and it also retained the authority to correct "administrative errors" made by employing offices, 5 C.F.R. § 890.103(b). Even if OPM's regulations do not themselves impose a duty on OPM to exercise its administrative authority in a manner that would prevent the enrollment from proceeding here, we do not believe those regulations may fairly be read to relieve OPM of any such implicit statutory duty it may otherwise have. So far as we are aware, OPM has never before viewed these regulations as an affirmative obstacle to OPM's attempt to correct an unlawful enrollment by an employing office. Indeed, on the basis of that retained discretionary authority, OPM has advised the carrier previously that it may not proceed with the enrollment.

More importantly, we do not believe that OPM may justify acting in a manner that would facilitate the enrollment here on the ground that it is merely permitting a carrier to implement a decision made by the employing office and not by OPM. A federal agency cannot, as a general rule, evade responsibility for its statutory obligations by delegating them to another agency. *See Conoco, Inc. v. Skinner*, 781 F. Supp. 298, 309 (D. Del. 1991) ("The Secretary cannot escape ultimate responsibility under these statutes by merely delegating responsibility to an inferior agency."); *cf. Campbell v. Galeno Chem. Co.*, 281 U.S. 599, 610 (1930)

("We cannot see that the Commissioner, under the guise of legislation, may do in gross what he had no power to do in detail." (internal quotation marks omitted)). To put it slightly differently, OPM could not validly promulgate a regulation that purported to allow same-sex spouses to enroll in benefit plans under the FEHBA, and we have found no support for the view that it could bring about this result by delegating enrollment decisions to another agency. *See Vierra v. Rubin*, 915 F.2d 1372, 1378 (9th Cir. 1990) ("[W]hen the Secretary delegates to a state's discretion the definition of an important statutory term, the states' authority to define the term can not [sic] exceed the authority given the Secretary by Congress in the first place. . . . The Secretary may thus delegate definitional responsibilities to the states *only to the extent* that the state's determinations are also consistent with the AFDC program generally. . . . The Secretary's delegation to Hawaii of the good cause definition is invalid to the extent that it allows Hawaii to exceed the scope of the Secretary's initial authority to formulate the definition.").

These general principles of administrative law seem particularly applicable here. There is no provision in the FEHBA itself that directly or clearly confers upon OPM the unusual authority effectively to waive a statutory limitation on eligibility requirements established by federal law. And there is no indication that OPM is generally understood to have such authority.[6] Other provisions in the FEHBA make clear that

---

[6] Indeed, Congress was previously encouraged to adopt an express waiver provision in a closely related context. Specifically, the FEHBA authorizes OPM to enter into contracts for group-practice prepayment plans. *See* 5 U.S.C. § 8903(4)(A). Under a prior version of the law, any such group practice was required by statute to "include physicians representing at least three major medical specialties who receive all or a substantial part of their professional income from the prepaid funds." *Id.* (1982). During 1983 hearings on amendments to the FEHBA, the then-president of an association of group-practice prepayment plans advocated for the "possibility of a waiver of the requirement that three specialties be []represented in HMO physician groups." *Federal Employees Health Benefits Reform Act of 1983: Hearing Before the Subcomm. on Comp. & Emp. Benefits of the H. Comm. on Post Office & Civil Serv.*, 98th Cong. 277 (1983) (statement of Dr. Donald F. Schaller, President, Group Health Association of America, Inc.); *see also Oversight on Federal Employees Health Benefits Program: Hearing Before the Subcomm. on Compensation & Employee Benefits of the H. Comm. on Post Office & Civil Serv.*, 99th Cong. 142 (1985) (advocating "[e]limination of the requirement that a comprehensive plan have three major medical specialties represented within its medical group" and arguing that "OPM should have the authority to determine whether a plan will be able to

Congress knew how to grant OPM discretion to waive eligibility limitations when it wanted to do so. For example, the FEHBA contains at least one express provision regarding waiver of statutorily defined eligibility requirements, and it is quite limited. Section 8905 of title 5 provides that an annuitant "who at the time he becomes an annuitant was enrolled in a health benefits plan . . . may continue his enrollment" if certain statutory conditions are met. The section also expressly provides that OPM "may, in its sole discretion, waive the requirements of this subsection in the case of an individual who fails to satisfy such requirements if [OPM] determines that, due to exceptional circumstances, it would be against equity and good conscience not to allow such individual to be enrolled as an annuitant in a health benefits plan." 5 U.S.C. § 8905(b). This waiver authority was one of a group of amendments made to the FEHBA in 1986. *See* Federal Employees Benefits Improvement Act of 1996, Pub. L. No. 99-251, 100 Stat. 14; *see also* 132 Cong. Rec. 1343 (Feb. 3, 1986) (noting that the proposed legislation would "[g]rant authority to the Office of Personnel Management [OPM] to waive certain eligibility requirements for annuitants to participate in the FEHBP"). The limited nature of this waiver authority reinforces the conclusion that OPM lacks the authority to permit the enrollment here to proceed, now that it has been made aware of it and has acted previously to prevent it on the ground that it was inconsistent with the FEHBA.

In sum, although we have not identified precedent that clearly requires OPM to take affirmative action to prevent it from being brought into violation of its governing statute in the situation at issue here, we believe the duty not to knowingly allow such a violation to take place follows from the FEHBA. That conclusion rests on several considerations: the FEHBA's limited express waiver provision, its plain limitations on OPM's authority to contract with a carrier to provide benefits to same-sex spouses of employees, and the more general principles of administrative

---

provide its benefits to the prospective members"). Congress subsequently responded not by granting OPM waiver authority but instead by amending section 8903, so that, under the terms of the statute, group-practice prepayment plans no longer must include three specialists. *See* 5 U.S.C. § 8903(4)(A) ("The group shall include at least 3 physicians who receive all or a substantial part of their professional income from the prepaid funds and who represent 1 or more medical specialties appropriate and necessary for the population proposed to be served by the plan.").

law regarding an agency's obligation to comply with statutory requirements. We think the duty is particularly evident here where it would not be difficult for OPM to ensure that the unlawful enrollment does not occur: OPM is aware of the pending enrollment, has already been asked once whether such an enrollment would be permissible, and can prevent the violation simply by issuing a directive (or letting stand its prior statements on the issue). Thus, this is not a case where the agency would have to expend considerable resources to prevent an unlawful enrollment from occurring.

## B.

Against this conclusion, OPM argues that it has discretion in this situation for either of two reasons. First, citing *Heckler v. Chaney*, 470 U.S. 821 (1985), OPM invokes the general principle that an agency has discretion to decide whether to seek to redress a violation of a statute it is charged with enforcing, and argues that its reasons for declining to enforce eligibility limitations here are akin to those found appropriate in *Heckler* itself. *See* E-mail for Jonathan Cedarbaum, Deputy Assistant Attorney General, Office of Legal Counsel, from Elaine Kaplan, General Counsel, Office of Personnel Management (Dec. 11, 2009, 1:11 PM EST). Second, OPM suggests that, in the past, it has exercised discretionary authority to refrain from correcting an enrollment that it believes to violate the Act's eligibility restrictions but that benefits an employee. These exercises of discretion, it claims, support its contention that the statutory framework it administers does not impose a mandatory duty to prevent enrollment in this case. *See* E-mail for David Barron, Acting Assistant Attorney General, and Jonathan Cedarbaum, Deputy Assistant Attorney General, Office of Legal Counsel, from Elaine Kaplan, General Counsel, Office of Personnel Management (Dec. 11, 2009, 3:07 PM EST). We find these arguments unpersuasive.

In *Heckler v. Chaney*, the plaintiffs alleged that the use of certain drugs in capital punishment was an "unapproved use of an approved drug" that violated the prohibition on misbranding in the Federal Food, Drug, and Cosmetic Act. On this basis, the plaintiffs challenged the failure of the Food and Drug Administration ("FDA") to initiate an enforcement proceeding. *See* 470 U.S. at 823–24 & n.1 (citing 21 U.S.C. § 352(f)). The Court rejected their challenge, concluding that the FDA had the discretion

not to prosecute alleged violations of the Act, noting that the "recognition of the existence of discretion is attributable in no small part to the general unsuitability for judicial review of agency decisions to refuse enforcement." *Id.* at 831. As the Court explained, "an agency decision not to enforce often involves a complicated balancing of a number of factors which are peculiarly within its expertise," such as the best use of agency resources and whether the agency is likely to prevail if it acts. *Id.*

There are certain provisions of the FEHBA that authorize OPM to enforce restrictions governing third-party conduct. *See, e.g.*, 5 U.S.C. § 8902a(d) (2006) ("Whenever [OPM] determines [that a provider engaged in various kinds of fraud] . . . [OPM] may . . . impose a civil monetary penalty of not more than $10,000 for any item or service involved."). And we do not doubt that in enforcing these provisions, OPM is entitled to substantial discretion in determining when it makes sense, given the agency's interests and resources, to take enforcement action. Here, however, OPM has not been charged with enforcing restrictions governing third-party conduct, but rather has itself been given the authority to confer benefits on a limited class of people. That an agency is allowed the discretion to determine when to exercise its authority to enforce laws that place obligations on third parties does not mean that the agency is free to ignore obligations and limitations Congress has specifically imposed on the agency itself in distributing benefits only to eligible persons. *Cf. Welch Foods, Inc. v. Borough of North East*, No. 98-246 Erie, 2001 U.S. Dist. LEXIS 3287, at *23 (W.D. Pa. Feb. 6, 2001) (concluding that the EPA did not have a "nondiscretionary duty to enforce each and every violation of the section" because "the language plainly imposes an obligation on the Borough *but not on EPA*" (emphasis added)).

*Heckler* itself acknowledged that "Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers. Congress may limit an agency's exercise of enforcement power if it wishes, either by setting substantive priorities, or by otherwise circumscribing an agency's power to discriminate among issues or cases it will pursue." 470 U.S. at 833; *see also* Cass R. Sunstein, *Reviewing Agency Inaction After* Heckler v. Chaney, 52 U. Chi. L. Rev. 653, 683 (1985) ("the *Chaney* decision, in keeping with the general direction of lower court cases over the past decade, made clear that judicial review of agency inaction is available when the agency's enforcement decision violates statutory [constraints]"). Indeed, even in the context of benefits

coverage, where the FEHBA grants OPM "broad discretionary authority to negotiate and contract for the benefits to be offered by health carriers," OPM must still "act in a manner consistent with the underlying purposes of the Act." *Nat'l Fed'n of Fed. Emps.*, 679 F.2d at 912; *see also Tackitt v. Prudential Ins. Co.*, 758 F.2d 1572, 1575 (11th Cir. 1985) ("The grant of authority given OPM to approve benefit plans is very broad. The OPM must act in a manner consistent with the goals and policies of FEHBA." (citation omitted)); *Doe v. Devine*, 703 F.2d 1319, 1326 n.30 (D.C. Cir. 1983) (Ginsburg, J.) (noting that section 8904's requirement that govern-ment-wide contracts include coverage for "catastrophic" illnesses is a "specific mandate," and that although "[c]atastrophic" is not defined in the Act, the requirement is nevertheless "'law,' capable of judicial con-struction consistent with FEHBA's goals, structure, and legislative histo-ry"); *Am. Fed'n of Gov't Emps. v. Devine*, 525 F. Supp. 250, 252 (D.D.C. 1981) ("While the Director has discretion to administer the FEHB in an efficient and effective way, the scope of his discretion is limited by the language of the statute and by the purposes for which it was enacted."); *cf. Nat'l Treas. Emps. Union v. Campbell*, 589 F.2d 669, 678 (D.C. Cir. 1978) ("Rather, [OPM's predecessor's] discretion under the Health Bene-fits Act, though broad, is bounded by Section 8902(i); and it is to the courts that the task of policing the boundary falls."); *GHS HMO, Inc. v. United States*, 76 Fed. Cl. 339, 360–61 (2007) ("Although the court agrees with the defendant that Congress has provided OPM with broad authority to administer the FEHBP, as the agency deems necessary, it is not limitless authority. . . . [T]his court should not sustain the agency's interpretation of the Final Year Regulation, as applied to the contracts at issue, if it is inconsistent with the statute, the FEHBA."). Here, where the FEHBA expressly mandates that OPM only enter into contracts with health benefit plans that provide benefits to certain specified groups, *Heckler* does not authorize OPM to disregard Congress's express legisla-tive direction and take action to permit the enrollment of a broader class of individuals.

In arguing otherwise, OPM identifies what might be thought of as "fac-tors peculiarly within its expertise," and suggests that that these factors show that its decision to permit enrollment is discretionary—just as cer-tain factors identified in *Heckler* supported the Court's conclusion that the enforcement authority of the Department of Health and Human Services was discretionary, and not mandatory, in that case. *See Heckler*, 470 U.S.

at 831–32. In our view, however, these special considerations do not warrant recognition of an implicit exception to OPM's general statutory obligations under the FEHBA in these circumstances.

Specifically, OPM cites inter-branch comity concerns in explaining why it believes it may permit this enrollment to proceed. OPM explains that this case involves a Judicial Branch employee and an order issued by a federal judge, albeit in the course of an administrative action. *See* Kaplan Memo at 7. As we have noted, however, the order at issue here was issued by a federal judge acting as an administrative officer of the courts in this setting, and as a result is not binding on OPM. Moreover, this enrollment request would ultimately come from the employing agency, the AOUSC, just as enrollment requests come from other employing agencies, including those in the Executive Branch. Certainly nothing in the FEHBA indicates that OPM's legal obligations under the statute are different with respect to determinations that the Judiciary makes as an employing agency as compared to determinations that an Executive Branch agency makes as an employing agency. We note that our conclusion in this regard is supported by the potentially broad consequences of a contrary construction of OPM's statutory authority. If comity concerns sufficed to allow OPM knowingly to permit an unlawful enrollment to proceed, then presumably OPM would be entitled to allow other enrollment decisions by the Judiciary, acting as an employing agency, that were similarly in contravention of the FEHBA's eligibility limitations. Yet there is no indication in the FEHBA that Congress intended to permit OPM to effectively retain the power to waive all FEHBA eligibility limitations as applied to judicial branch employees.

We are also aware that OPM, by declining to act, may advance its interest in avoiding litigation. We do not think, however, that the interest in avoiding litigation can provide a basis for construing the FEHBA to allow OPM to permit the enrollment here to occur. An agency administering a benefits program risks litigation whenever it complies with a statutory limitation on eligibility, because such action necessarily means that a person has been denied enrollment in a federal program, thus giving rise to a potential case or controversy. But precisely for that reason, the desire to avoid litigation does not support the conclusion that the agency possesses the authority to waive a statutory restriction on eligibility. Indeed, if Ms. Golinski were to sue to seek her spouse's enrollment, OPM would be without authority to enter into a binding settlement agreement that

provided health benefits to her spouse, precisely because it has no authority to confer such benefits under the FEHBA. *See Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 126, 136 (1999) ("Congress may place limits on the scope of the Attorney General's settlement power through the general laws that govern the conduct of the agencies on behalf of which the Attorney General purports to settle.").

Finally, OPM points to past administrative practice to support its view that it possesses the discretion to act in a manner that would permit the enrollment to proceed. *See* E-mail for David Barron, Acting Assistant Attorney General, and Jonathan Cedarbaum, Deputy Assistant Attorney General, Office of Legal Counsel, from Elaine Kaplan, General Counsel, Office of Personnel Management (Dec. 11, 2009, 3:07 PM EST); E-mail for Jonathan Cedarbaum, Deputy Assistant Attorney General, Office of Legal Counsel, from Elaine Kaplan, General Counsel, Office of Personnel Management (Dec. 11, 2009, 1:11 PM EST). In fact, however, its past practice appears to support the opposite conclusion.

OPM relies in particular on a practice under the Federal Employees Group Life Insurance program of not seeking repayment of premiums that were paid for individuals who were later determined to be ineligible to receive benefits. *See* E-mail for Jonathan Cedarbaum, Deputy Assistant Attorney General, Office of Legal Counsel, from Elaine Kaplan, General Counsel, Office of Personnel Management (Dec. 11, 2009, 1:11 PM EST). But there appears to be express statutory authority that, subject to certain defined limitations, gives federal agencies the general discretion to "waive[] in whole or in part" claims to recoup "erroneous payment of pay or allowances" where collecting the erroneous payments "would be against equity and good conscience and not in the best interests of the United States." 5 U.S.C. § 5584 (2006); *see also* Memorandum for Ellen Tunstall, Chief, Insurance Planning and Evaluation Division, Office of Insurance Programs, from James S. Green, Associate General Counsel, Office of Personnel Management, *Re: FEGLI-LET STANDS* at 5 (June 6, 1997).[7] In contrast, we know of no similarly general statutory authority

---

[7] Health premiums paid under the FEHBP are apparently covered by this provision. *See, e.g.*, *Matter of Alfred H. Varga*, B-260909, 1996 WL 725730, at *4 (Comp. Gen. 1996) ("This Office has consistently held that the total amount of the employee's debt due the United States includes both the amount the employee received directly and other

that would allow an agency to permit enrollment of persons in govern-ment-sponsored health plans who are statutorily ineligible to enroll. Instead, with respect to the FEHBA, we have identified only a limited statutory waiver provision, discussed above, that is inapplicable here, and no other waiver provision that would be applicable. The practice cited by OPM therefore does not imply the existence of the discretion it asserts. Further, the practice OPM cites concerns claims for recoupment of erro-neously paid premiums, not a decision to permit a statutorily ineligible person to enroll where OPM becomes aware of the pending enrollment in advance. OPM has advised us that when it discovers that an ineligible person is enrolled, it has uniformly terminated that person's coverage going forward. OPM is aware of no instance in which it has knowingly permitted an ineligible person to remain enrolled.[8]

DAVID J. BARRON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

amounts disbursed on his behalf for such items as medicare, health benefits, savings account, life insurance, retirement, and federal and state tax withholdings.").

[8] OPM advises that it has, on occasion, declined to require carriers to seek recoupment of benefits payments made for individuals who were later determined to have been erroneously enrolled. *See generally* BC/BS Contract § 2.3(g) (providing normal proce-dures for recoupment of erroneous payments). But, as discussed above, OPM's statutory obligation is limited to the requirement that it contract with providers that, as a matter of course, only provide benefits to certain defined classes of individuals. Thus, if OPM discovers that a carrier has erroneously enrolled and paid benefits to an individual who is statutorily ineligible, it may be obliged to ensure that the individual's enrollment is terminated, even if it is not obliged to try to undo the past consequences of the violation. Relatedly, we do not think this case is comparable to OPM's example of an appropriate exercise of discretion with regard to the enrollment of an otherwise ineligible person; that is, when an individual who was previously enrolled needs a grace period in which to obtain alternate health insurance after it is determined that he or she is not eligible for continued enrollment. We do not believe enrolling for an indefinite period a person who has never been enrolled is the equivalent of allowing a person who was previously enrolled to retain his or her insurance for a short, defined period of time. The former approves of the enrollment of someone who is statutorily ineligible in a way that the latter does not. Moreover, in the latter case, there are arguably individual reliance interests at stake. That is evidently not the case here, and it is significant to our conclusion that in this case the question of OPM's legal obligations to prevent an unlawful enrollment arises at the pre-enrollment stage.